## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| *John David Battaglia*, | |
| | No. 3-16-CV-001687-B |
| Petitioner, | |
| | **Death Penalty Case** |
| v. | |
| | <u>Execution Date – Feb. 1, 2018</u> |
| *Lorie Davis*, Director, Texas Department of Criminal Justice, Correctional Institutions Division, | |
| | |
| Respondent | |

## BATTAGLIA'S <u>OPPOSED</u> MOTION FOR STAY OF EXECUTION

Gregory W. Gardner
P.O. Box 2366
Boulder, Colorado 80306
Phone: (303) 552-2979
Fax: (202) 747-2986
gardnerlegal@gmail.com
Attorney for Petitioner

Michael Mowla
P.O. Box 868
Cedar Hill, TX 75106
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Petitioner

## I. Table of Contents

I. Table of Contents ................................................................................................ 2

II. Table of Authorities ........................................................................................... 4

III. Table of Appendix ............................................................................................. 6

IV. Summary of Requested Relief ........................................................................... 7

V. Procedural History ............................................................................................. 7

VI. Facts .................................................................................................................... 9

    1. Prior to the Hearing, Battaglia filed a pre-hearing funds-request for expert and investigative assistance, and the trial court denied the request for investigative assistance for a mitigation investigator ........................... 9

    2. Four experts evaluated Battaglia for the Hearing ................................. 10

    3. Three experts (Drs. Proctor, Allen, and Mosnik) found that Battaglia suffers from Delusional Disorder of the Persecutory Type, found no evidence of malingering, and thus found that Battaglia is incompetent to be executed ................................................................................... 12

        i. Three of the experts diagnosed Battaglia with Delusional Disorder is the Persecutory Type ............................................. 12

        ii. Details of Dr. Proctor's examination, testimony, and opinions ............. 13

        iii. Details of Dr. Allen's examination, testimony, and opinions ................ 15

        iv. Details of Dr. Mosnik's examination, testimony, and opinions ............ 17

    4. Womack used the pre-*Panetti*-standard for execution-competency, conducted no testing or assessment of malingering, and made conclusory findings that Battaglia is too intelligent to suffer from Delusion Disorder ................................................................................ 19

VII. Argument ......................................................................................................... 21

    1. Battaglia's counsel have not had a meaningful opportunity to investigate and prepare a habeas corpus application for Battaglia ...................... 21

    2. As Battaglia details above in the facts and in his opposed motion for investigative funding filed immediately prior to the filing of this motion, he has meritorious claims. Thus, *Harbison* and 18 U.S.C. § 3599 mandates that Battaglia receive investigative services through a

mitigation specialist before he files a habeas petition, and Battaglia
needs time to litigate these issues...........................................................................25

VIII.   Conclusion and Prayer ........................................................................................31

IX.   Certificate of Conference ..................................................................................32

X.   Certificate of Service ........................................................................................32

## II.  Table of Authorities

**Cases**

*Aldridge v. Thaler*, No. H-05-608, 2010 U.S. Dist. LEXIS 137529 (S.D. Tex. March 17, 2010)...................................................................................................... 11

*Battaglia v. State*, No. AP-77,069 (Tex. Crim. App. Dec. 2, 2016) (per curiam) ......................... 8

*Battaglia v. State*, No. AP-77,069, 2017 Tex. Crim. App. LEXIS 908 (Tex. Crim. App. Sep. 20, 2017) (Alcala, J. dissenting) (designed for publication)................ 8, 28, 29, 30

*Battaglia v. Stephens*, 824 F.3d 470 (5th Cir. 2016).......................................................... 8, 23, 24

*Battaglia v. Stephens*, No. 3:16-CV-0687-B, 2016 U.S. Dist. LEXIS 35703 (N.D. Tex. Mar. 18, 2016) ................................................................................................... 7

*Battaglia v. Texas*, No. 17-7165 (U.S.)......................................................................................... 9

*Browning v. Navarro*, 887 F.2d 553 (5th Cir. 1989) ................................................................... 23

*Colburn v. Cockrell*, No. 03-20301, 2003 U.S. App. LEXIS 29526 (5th Cir. 2003) (unpublished) .......................................................................................................... 12

*Corley v. United States*, 556 U.S. 303 (2009)............................................................................. 26

*Druery v. State*, 412 S.W.3d 523 (Tex. Crim. App. 2013) ........................................................ 11

*Eldridge v. Stephens*, No. 05-cv-01847, 2009 U.S. Dist. LEXIS 106991 (S.D. Tex. Nov. 17, 2009) ....................................................................................................... 31

*Ex parte Buck*, 418 S.W.3d 98 (Tex. Crim. App. 2013) ............................................................ 11

*Ford v. Wainwright*, 477 U.S. 399 (1986) .................................................................................. 31

*Grannis v. Ordean*, 234 U.S. 385 (1914).................................................................................... 31

*Green v. State*, 374 S.W.3d 434 (Tex. Crim. App. 2012) .......................................................... 11

*Green v. Thaler*, No. H-07-827, 2012 U.S. Dist. LEXIS 144890 (S.D. Tex. Oct. 8, 2012).......................................................................................................................... 11

*Harbison v. Bell*, 556 U.S. 180 (2009) ................................................................................. 21, 22

*In re Hearn*, 376 F.3d 447 (5th Cir. 2004).................................................................................. 25

*In re Hearn*, 389 F.3d 122 (5th Cir. 2004).................................................................................. 25

*Jimenez v. Quarterman*, 555 U.S. 113 (2009) ........................................................................... 26

*Martel v. Clair*, 565 U.S. 648 (2012) ........................................................................ 27

*Mays v. State*, 476 S.W.3d 454 (Tex. Crim. App. 2015) ........................................... 30

*McFarland v. Scott*, 512 U.S. 849 (1994) ................................................................. 27

*Panetti v. Davis*, 863 F.3d 366 (5th Cir. 2017) ........................................................ 12

*Ward v. Stevens*, 777 F.3d 250 (5th Cir. 2015) ........................................................ 26

*Whitaker v. Stephens*, H-11-CV-2467, 2015 U.S. Dist. LEXIS 35434 (S.D. Tex. March 17, 2015) ....................................................................................................... 12

*Williams v. City of New Orleans*, 763 F.2d 667 (5th Cir. 1985) ............................... 24

**Statutes**

18 U.S.C. § 3006A (2017) .......................................................................................... 27

18 U.S.C. § 3599 (2017) ....................................................................................... passim

Tex. Code Crim. Proc. Art. 46.05(h) (2016) ...................................................... 29, 30

**Treatises**

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 90-94 (5th ed. 2013) .................................................................................. 13

### III. Table of Appendix

- Motion for leave for investigative services filed in state court (App.001-007)

- Motion for pre-application funds filed in state court (App.008-023)

- Order on motion for pre-application funds filed in state court (App.024)

- *Battaglia v. State*, No. AP-77,069, 2017 Tex. Crim. App. LEXIS 908 (Tex. Crim. App. Sep. 20, 2017) (designed for publication) (App.025-078)

- Vitae of Dr. Proctor (State-expert) (App.079-084)

- Vitae of Dr. Allen (court-appointed-expert) (App.085-089)

- Vitae of Womack (court-appointed-expert) (App.090-096)

- Vitae of Dr. Mosnik (defense-expert) (App.097-106)

- Evaluation of Dr. Mosnik (defense-expert) (App.107-125)

- Evaluation of Dr. Allen (court-appointed-expert) (App.126-132)

- Evaluation of Dr. Proctor (State-expert) (App.133-141)

- Evaluation of Womack (first) (court-appointed-expert) (App.142-152)

- Evaluation of Womack (second) (court-appointed-expert) (App.153-159)

- DSM-5 for Delusional Disorder (App.160-163)

- Trial Court's Ruling (CR-Supp-Ruling) (App.164-177)

- Warrant of Execution (for Feb. 1, 2018) (App.178-189)

- RR1 *Panetti/Ford* Hearing (App.190-400)

- RR2 *Panetti/Ford* Hearing (App.401-539)

**\*\*\*Note: the Bates-Numbering in this case is located on the bottom-right-hand corner of each page of the Appendix**

To the Honorable United States District Judge Jane Boyle:

Petitioner John David Battaglia files this **opposed** motion for stay of execution:

## IV.  Summary of Requested Relief

1.      Battaglia will request that the Court stay the execution date of February 1, 2018 so that he may meaningfully exercise his representation rights under 18 U.S.C. § 3599 (2017) and receive due process as to his *Ford/Panetti* claim in federal habeas corpus proceedings. This includes his pending petition before the Supreme Court of the United States ("SCOTUS") and his request for funding for investigative services for further investigation of his *Ford/Panetti* claim as required under 18 U.S.C. § 3599 (2017).

## V.  Procedural History

2.      On December 16, 2015, Texas set Mr. Battaglia's execution date for March 30, 2016.  On February 22, 2016, undersigned counsel Gardner filed a motion for appointment of counsel in state court to investigate, prepare, and file a motion raising an Eighth Amendment execution incompetency claim in state court. The motion was summarily denied on March 1, 2016, without any reasons given.

3.      Battaglia is set for execution on **February 1, 2018**. (App.178-189).

4.      On March 10, 2016, under 18 U.S.C. § 3599 (2016), Battaglia filed an emergency motion to appoint counsel and a motion for stay of execution in the federal district court so that he may investigate the factual bases for and prepare a habeas application under *Panetti*. *Battaglia v. Stephens*, No. 3:16-CV-0687-B, 2016 U.S. Dist. LEXIS 35703 (N.D. Tex. Mar. 18, 2016). On March 18, 2016, this district court denied the motion. *Id*. at *30.

5.      On March 30, 2016 (execution-date), the Fifth Circuit stayed the execution, reversed this Court's March 18, 2016 order, and appointed Mr. Gardner as counsel under 18 U.S.C.

7

§ 3599 (2016). *Battaglia v. Stephens*, 824 F.3d 470, 474-476 (5th Cir. 2016). Undersigned counsel

Mowla was appointed later by this Court, also under 18 U.S.C. § 3599 (2016).

6.      On July 21, 2016, Battaglia filed in state court a motion for pre-Article 46.05(f)-

hearing funds for expert and investigative assistance.  (App.001-023). *See* Tex. Code Crim. Proc.

Art. 46.05(f) (2016). Battaglia requested investigative services to assist his counsel with,

"collecting information about Battaglia's background (including environmental and genetic risk

factors) and present understanding of his death sentence by interviewing collateral sources,

including Mr. Battaglia's family members and others with whom Mr. Battaglia communicates."

(App.011).

7.      On July 29, 2016, the state court granted Battaglia's counsel's request in part to

retain expert services, inclusive of travel, but denied the motion for investigative services in its

entirety. (App.024).

8.      On October 19, 2016, Battaglia filed a motion under Article 46.05(f)/*Ford*/*Panetti*

in the trial court, and the hearing was held on November 13-14, 2016 ("Hearing").

9.      On November 18, 2016, the trial court denied Battaglia's motion. (App.164-177).

10.     On November 21, 2016, Battaglia filed in the Texas Court of Criminal Appeals

("TCCA") a motion to stay execution, which was granted on December 2, 2016. *Battaglia v. State*,

No. AP-77,069 (Tex. Crim. App. Dec. 2, 2016) (per curiam).

11.     On September 20, 2017, the TCCA affirmed the trial court's order. *Battaglia v.*

*State*, No. AP-77,069, 2017 Tex. Crim. App. LEXIS 908 (Tex. Crim. App. Sep. 20, 2017) (Alcala,

J. dissenting) (designated for publication) ("Opinion") (App.025-078).

12.     On October 30, 2017, the trial court scheduled an execution date for February 1, 2018. This is even though the Fifth Circuit stayed the first execution date of March 30, 2016 so that Battaglia's counsel may pursue all legal remedies available under 18 U.S.C. § 3599 (2016).

13.     On December 13, 2017, Battaglia filed a petition for writ of certiorari in the SCOTUS seeking review of the TCCA's decision. *See Battaglia v. Texas*, No. 17-7165 (U.S.). The petition is pending.

## VI. Facts

**1.   Prior to the Hearing, Battaglia filed a pre-hearing funds-request for expert and investigative assistance, and the trial court denied the request for investigative assistance for a mitigation investigator**

14.     Prior to the Hearing, Battaglia filed a motion for pre-hearing funds-request for expert and investigative assistance.  (App.001-023). The motions are attached as App.001-023 and are incorporated in full into this motion as though recited verbatim.

15.     In the motions, Battaglia pleaded that: (1) Dr. Diane Mosnik, a forensic psychologist, be appointed as the mental-health expert; and (2) he receive authorization to retain mitigation services from Nicole VanToorn, a mitigation specialist. (App.009-012).

16.     Counsel needed Ms. VanToorn to act as the mitigation investigator to: (1) obtain and review voluminous records from TDCJ and Battaglia's medical records, which to counsel's knowledge had not been collected or reviewed by previous counsel; (2) collect information about Battaglia's background, including environmental and genetic risk-factors; and (3) and present understanding of his death sentence by interviewing collateral sources, including Battaglia's family members and others with whom Battaglia communicates.

17.     VanToorn charges $100 per hour. Counsel concluded that utilizing her services: (1) would be more cost-effective to accomplish the work than if counsel did so; (2) is necessary

because she has the experience and training to conduct interviews involving sensitive mental health and background issues that counsel lack; and (3) is essential to the investigation and preparation of the *Ford/Panetti*-claim since none of the prior counsel developed a mitigation or mental health profile that addresses Battaglia's competency for execution; nor did prior counsel investigate Battaglia's psychosocial history.

18.    Further, counsel determined that neither state nor federal habeas counsel conducted an independent investigation into Battaglia's background, mental health, or execution competency. Although prior federal counsel sought and received funding for a private investigator to investigate Battaglia's factual allegations, she did **not** seek or receive funding for mitigation or neuropsychological investigations and evaluations. Thus, those funds were **not** expended to investigate Battaglia's mental health or background or as it pertains to execution-incompetency.

19.    Counsel estimated that between collecting records, interviewing collateral sources, consulting with counsel and Dr. Mosnik, and traveling, VanToorn would spend about 150 hours on this case. On July 29, 2016, the state court denied the motion for funds for the mitigation expert. (App.024).

### 2.   Four experts evaluated Battaglia for the Hearing

20.    The experts who evaluated Battaglia were: Dr. Proctor (State-expert: App.079-084.133-14.267-314; RR1.78-125), Dr. Allen (court-appointed expert: App.085-089.126-132.329-398; RR1.140-209); Dr. Mosnik (Battaglia's expert: App.097-125.199-265.481-520; RR1.10-76; RR2.81-120), and Dr. Womack (court-appointed expert: App.090-096.406-480; RR2.6-80).

21.     The evaluations, opinions, and sworn testimonies of these experts are attached in the Appendix as referenced in the paragraph above, and are incorporated in full into this motion as though recited verbatim.

22.     Dr. Proctor, the **State's expert**, is board certified in forensic psychology with 16 years of professional experience. (RR3.SX-10.1; App.079). Competency issues are a substantial part of his practice. The reason he had written a report in only one prior competency-to-be-executed case is because they seldom arise. (RR1.79-80; App.268-269).

23.     Dr. Allen, the court-appointed expert who was **handpicked by the trial court**, previously worked at a Forensic Internship Forensic Psychiatric Unit, has over 24 contact hours of training in Forensic Psychology since 1975, has practiced primarily forensic psychology since 1987 in Texas district courts, and had 24 hours of continuing education in 2014 and 25 hours in 2015. (RR3.SX-11; App.085).

24.     Dr. Mosnik, the defense-expert, who was accepted by the trial court as an expert in forensic psychology (RR1.17; App.206) was the expert in *Druery v. State*, 412 S.W.3d 523, 530-531, 541-542 (Tex. Crim. App. 2013). Based in part on her testimony, the TCCA held that the inmate made a substantial showing of incompetency, was entitled to further competency proceedings, and ordered the stay-of-execution to remain in effect pending the outcome of the proceedings.

25.     Dr. Mosnik has also testified or was involved in these Texas death-row cases: *Ex parte Buck*, 418 S.W.3d 98 (Tex. Crim. App. 2013) (Asperger's Syndrome as mitigation issue); *Green v. State*, 374 S.W.3d 434 (Tex. Crim. App. 2012) & *Green v. Thaler*, No. H-07-827, 2012 U.S. Dist. LEXIS 144890 (S.D. Tex. Oct. 8, 2012) (competency-to-be-executed); *Aldridge v. Thaler*, No. H-05-608, 2010 U.S. Dist. LEXIS 137529 (S.D. Tex. March 17, 2010) (competency

to stand trial); *Colburn v. Cockrell*, No. 03-20301, 2003 U.S. App. LEXIS 29526 (5th Cir. 2003) (unpublished) (competency-to-be-executed, qualified opinion, more testing required); and *Whitaker v. Stephens*, H-11-CV-2467, 2015 U.S. Dist. LEXIS 35434 (S.D. Tex. March 17, 2015) (diminished capacity).

26.     And, Dr. Mosnik was the recent expert in Scott Panetti's case, where with limited review due to the lack of funding, she determined that "Panetti had exhibited worsening signs of acute psychosis in the year prior," and after Panetti's counsel cited Panetti's "prison medical records, observing what he believed were "alarming and aberrational changes in Mr. Panetti's behavior over the last two years," Panetti's counsel pleaded to the court that he needed "to be appointed and granted funds to retain Dr. Mosnik to develop these preliminary impressions." *Panetti v. Davis*, 863 F.3d 366, 371-372 (5th Cir. 2017).

### 3.   Three experts (Drs. Proctor, Allen, and Mosnik) found that Battaglia suffers from Delusional Disorder of the Persecutory Type, found <u>no</u> evidence of malingering, and thus found that Battaglia is <u>incompetent to be executed</u>

#### i.   Three of the experts diagnosed Battaglia with Delusional Disorder is the Persecutory Type

27.     Per the DSM-5, Delusional Disorder requires: (A) the presence of one or more delusions with a duration of one month or longer; (B) criterion A for schizophrenia has never been met (and hallucinations, if present, are not prominent and are related to the delusional theme, such as the sensation of being infested with insects associated with delusions of infestation; (C) apart from the impact of the delusions or its ramifications, functioning is not markedly impaired, and behavior is not obviously bizarre or odd; (D) if manic or major depressive episodes have occurred, these have been brief relative to the duration of the delusional periods; and (E) the disturbance is not attributable to the physiological effects of a substance or another medical condition and is not better explained by another mental disorder, such as body dysmorphic disorder or obsessive-

compulsive disorder. (RR1.39-40; RR3.DX-20; App.160-163.228-229); *see* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 90-94 (5th ed. 2013).

28.    One type of Delusional Disorder is the Persecutory Type, which involves the individual's belief that he is being conspired against, cheated, spied on, followed, poisoned or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals. *Id*. Delusions are fixed beliefs that are **not** amenable to change considering conflicting evidence and are determined based, in part, on the degree of conviction held by the individual despite clear and reasonable contradictory evidence regarding the veracity of the beliefs. (App.124).

29.    Drs. Proctor, Allen, and Mosnik concluded that Battaglia suffers from Delusional Disorder of the Persecutory Type, a severe mental illness, and found **no** evidence that Battaglia was malingering. (RR1.39; RR3.DX-2.DX-3.DX4; App.107-141).

30.    Based on the testing and evaluation of Battaglia, and review of the materials, Drs. Proctor, Allen, and Mosnik concluded that Battaglia is **incompetent to be executed**. (RR1.38.47.105.171.183; App.107-141.227.236.294.360.372).

### ii.   Details of Dr. Proctor's examination, testimony, and opinions

31.    Dr. Proctor: (1) spent eight hours with Battaglia; (2) reviewed jail calls, correspondence, federal filings, health records, competency and insanity reports issued prior to the 2002 trial, (3) watched the videos provided by the State, (4) read the arrest and offense reports, (5) read the declaration of Dr. Mosnik from October 17, 2016, (6) read the pleadings, (7) read the Report of Dr. Allen, and (8) read the Competency for Execution Report, Test Data of Dr. Mosnik, and TDCJ records. (RR1.81; App.134.270). Dr. Proctor administered the M-FAST and PAI. (RR1.119; CR-Supp-Motion.81; App.113). On the M-FAST, which is a screening interview designed to assess the likelihood that an individual is faking psychiatric illness (malingering),

Battaglia's score fell well below the recommended cut-off score, was within normal limits, and was **not** suggestive of malingering. (RR1.119-120; App.137.308-309). The PAI, an objective measure of psychological and personality functioning that provides information about the test taker's response style through validity scales and psychological and personality functioning through the clinical scales, includes three indicators relevant to malingering: two indicators were within the normal range and one was at the cut-off, thus showing **no** malingering. (RR1.120; App.137.309). The clinical-scale results showed prominent paranoia and thoughts of persecution, and a diagnosis of Delusional Disorder of Persecutory Type. (RR1.86; App.136-137.275).

32.    Dr. Proctor observed and noted the following: (1) Battaglia's answers were long, rambling, and quickly drifted away from the questions; (2) when agitated, Battaglia cursed angrily and used various derogatory terms, including race and sexuality; (3) several times Battaglia's anger escalated such that Dr. Proctor was concerned about him acting out aggressively; (4) Battaglia provided a "highly delusional account of his cat dying" by attributing the death of his cat, which was hit by a car, to being influenced by the presence of a strange, large black cat that served as an "omen" of where his life was heading; (5) Battaglia recalled this large black cat looking at him as he was tending to his deceased cat as if to say, "you better watch out"; (6) Battaglia's memory of many events appeared distorted by delusional thinking; (7) Battaglia presented fixed beliefs of persecution that appeared to stem from a significant paranoid delusional system, and the beliefs are highly complex and detailed and involve a "seemingly endless cast of people and organizations"; (8)  Battaglia's presentation appeared consistent with above-average intellectual-functioning, and was consistent with intelligence-testing conducted by Dr. Mosnik; (9) Battaglia did **not** present himself as someone who is "mentally ill," and in fact, expressed significant anger with the allegations of his attorneys that he is mentally ill and incompetent to be executed; further,

14

he denied being mentally ill or incompetent, and argued that his attorneys should "focus their efforts on litigating a litany of injustices regarding his case that resulted in him being convicted and sentenced to death as part of a vast cover-up and conspiracy involving numerous individuals and organizations"; (10) Battaglia demonstrated significant impairment when asked about areas relevant to **rational** understanding; (11) Battaglia's rational understandings he may have had eroded with time due to the development of prominent paranoid delusions; and (12) Battaglia appears to genuinely believe that he was convicted of Capital Murder and sentenced to death due to a vast conspiracy and cover-up that is highly complex and involves numerous individual or entities including his ex-wives, prior attorneys, the judge who presided over the trial, the DA's office, and the jury that convicted and sentenced him to death. (RR1.90.95.100.102; App.136-137.279.284.289.291). Dr. Proctor also noted other aspects of Battaglia's presentations that he found to clearly be irrational. (RR1.95; App.136-137.284).

33.     Dr. Proctor concluded that under *Panetti v. Quarterman*, 551 U.S. 930 (2007), Battaglia is incompetent for execution because although he is aware of the State's rationale for his execution, he does **not** have a rational understanding of it. (RR1.103-105; App.116).

### iii.  Details of Dr. Allen's examination, testimony, and opinions

34.     Dr. Allen: (1) spent four hours with Battaglia; (2) reviewed jail calls, correspondence, federal filings, health records, competency and insanity reports issued prior to the 2002 trial, (3) watched videos provided by the State, (4) read TDCJ records, and (4) although he did not conduct testing, he reviewed the testing results provided to him by Drs. Proctor and Mosnik. (RR1.145-147; App.126-127.334-336).

35.     Dr. Allen observed and noted that: (1) Battaglia insisted that the trial and conviction were a "sham," the jury was "blood thirsty" and "rigged" by the judge, the prosecutor, and his trial

15

counsel; (2) although Battaglia is aware that he was convicted of Capital Murder, in a pretrial video, Battaglia "essentially confessed to the murders and became quite distraught during the interview" and "indicated he wanted to be punished so he could be with his girls, and when he pulled the trigger," and also "…thought (he) was putting them to bed"; (3) at the time that the pretrial video was made, Battaglia was expressing paranoid and persecutory delusions regarding his ex-wives; (4) Battaglia's delusions appeared as psychological defenses and rationalizations, but his mental functioning deteriorated with time possibly due to the isolation of death row; (5) **prior to** the 2002 trial, Battaglia appears to have developed delusions that his ex-wives engaged in "lying" to him; (6) Battaglia claimed that his first wife threatened to abort their child unless he married her; (7) Battaglia referred to persons in the law firm where his first wife worked as reflecting "…a certain ilk over there"; (8) Battaglia claimed that the divorce-conflict with his second wife revolved around "a tax fraud issue"; (9) Battaglia said he was visited by agents of the IRS/CID, who suggested his wife and her family may have been engaged in money laundering and prostitution; (10) Battaglia claimed he was advised by the IRS/CID agents to "walk away from his community property," and file his returns as an individual, or they would prosecute him for filing fraudulent returns with his wife for the prior several years; (11) Battaglia's statements over time reflected an intensification of delusions to include those related to "child molesters," "homosexuals and lesbians," the KKK, "rings" of homosexual attorneys and prosecutors, drug-abusing attorneys, psychiatrists, and judges, money-laundering and prostitution, and attorneys engaged in bribery and drugs; (12) he was drugged and does **not** recall the murders; (13) the case is a conspiracy against him; (14) this "whole thing" is much larger and is about faith and freedom (Faith and Liberty) in the United States; (15) his ex-wives, prosecutors, defense attorneys, and judges have conspired and are conspiring against him to prevent him from getting a fair trial and from demonstrating

16

exculpatory evidence; and (16) Battaglia's delusional system is generating impairment. (RR1.149-150.157-166.180; CR-Supp-Motion.74-75; App.106-107).

36.     Dr. Allen opined that Battaglia is **not** malingering his Delusional Disorder because: (1) Battaglia's paranoid and persecutory ideation predated the murders; (2) it would take "extraordinary energy" to consistently present as he does over so many years; that doing so is very difficult to do successfully; (3) Battaglia would **not** score in a direction indicating malingering on typical measures of psychiatric magnification; (4) the result of the M-FAST score administered by Dr. Proctor, which did not suggest malingering, supports Dr. Allen's findings; (5) Battaglia does **not** claim to suffer from a mental illness (Battaglia also told the other experts he did not suffer from mental illness); (6) Battaglia's presentations were consistent during the examination, and considered them delusional; (7) Battaglia's delusional-system has become widespread and complex, and is well documented in the records; (8) **Battaglia's delusions to be "…incredibly consistent over time, which is really difficult to do if the delusions are not genuine"** (emphasis supplied); (9) **Battaglia's complex delusional system appears to be impairing a rational understanding of the reason for the execution,** and thus Battaglia's delusions appear to be genuine. (emphasis supplied). (RR1.151.167-177; App.129-131.340.356-366)

37.     Dr. Allen concluded that Battaglia is incompetent for execution because although he is aware of the State's rationale for his execution, he does **not** have a rational understanding of it. (App.131).

### iv.  Details of Dr. Mosnik's examination, testimony, and opinions

38.     Dr. Mosnik: (1) spent 16 hours with Battaglia; (2) conducted 17 tests; (3) reviewed jail calls, correspondence, federal filings, health records, competency and insanity reports issued

prior to the 2002 trial, (4) watched videos provided by the State, and (5) read TDCJ records. (App.098-099).

39.     Battaglia's clinical profile scores were consistent with a clinical diagnosis of Delusional Disorder, which includes a consistent pattern of delusional thinking characterized by the presence of significant persecutory delusions with some component of grandiose delusional thinking. (RR1.35.40; App.122.124.224.229).

40.     Battaglia meets the DSM-5 clinical diagnostic criteria for Delusional Disorder of the Persecutory Type because: (1) the testing and evaluation revealed irritability and hypomanic activation, and the absence of cognitive impairment; (2) Battaglia exhibits the presence of one or more delusions with a duration of one month or longer; (3) the criteria for schizophrenia have never been met; (4) Battaglia's level of functioning is **not** markedly impaired apart from the impact of the delusions or their ramifications; (5) if manic or major depressive episodes have occurred, they have been shorter relative to the duration of the delusions; (6) the delusions are not attributable to the physiological effects of a substance or another medical condition or better explained by another mental disorder; and (7) the presence of mood symptoms that meet full criteria for a mood disorder can be superimposed on a diagnosis of delusional disorder. (RR1.23.39.40.70; App.124.212.228.229.259).

41.     Dr. Mosnik concluded that Battaglia was **not** malingering because: (1) he met **none** of the items on the malingering index developed by Bolter and only one of the items suggested by Tenhula and Sweet, falling below the cut-off and suggesting **no** evidence for the presence of malingering or poor effort; (2) his total score on the M-FAST fell significantly below the cut-off score for the total scale and each of the individual subtest cut-off scores, rendering it **highly unlikely** that Battaglia was feigning or malingering psychiatric symptoms; (3) his total score was

18

1, which was explained by being related to allergies or to actual bugs being present rather than a true psychotic symptom; (4) his clinical presentation and behavior are consistent with the clinical presentation of individuals diagnosed with delusional disorder and not with individuals feigning a psychiatric disorder; and (5) he does **not** seek mental health visits or treatment with possible medications because he does not believe that he has a mental illness. (RR1.21.22.30.33.50; App.119-124.210.211.219.222.239).

42.     Dr. Mosnik concluded that under *Panetti*, Battaglia is incompetent for execution because although he is aware of the State's rationale for his execution, he does **not** have a rational understanding of it. (App.125).  Dr. Mosnik also observed that: (1) Battaglia's Delusional Disorder interferes with Battaglia's ability to accurately interpret, perceive, and respond to the world around him, (2) the severity and nature of the mental illness deprives Battaglia of a rational understanding of the connection between his crime and punishment, and (3) although Battaglia has a factual awareness that an execution date had been scheduled and is imminent for the crime for which he was tried and convicted, he does **not** believe that he will be executed because of his illogical, fixed, and firmly held delusional belief system. (App.125).

   **4.  Womack used the pre-*Panetti*-standard for execution-competency, conducted <u>no</u> testing or assessment of malingering, and made conclusory findings that Battaglia is too intelligent to suffer from Delusion Disorder**

43.     Prior to his first "evaluation" of Battaglia, Womack conducted **no** testing, reviewed a one-page court order, and reviewed only videos provided by the State. (RR3.DX-5-1; App.142).

44.     Womack stated that it was "pretty rare" for him to be involved with a defendant charged with Capital Murder. (RR2.23; App.423).

45.     Womack conducted a second "evaluation," claiming that he noticed a "…disparity between Mr. Battaglia's emotional presentation during assessment with three other examiner's

(sic) and that of the current one," he contacted the trial court and received permission to "…conduct further assessment of Mr. Battaglia…" (RR3.DX-22-1; App.153).

46.     Prior to this "further (second) assessment (evaluation)," Womack reviewed the competency-to-be-executed reports of Drs. Proctor, Allen, and Mosnik, and one psychiatric evaluation conducted in 2002. (RR3.DX-22-1; App.153).

47.     During the first "evaluation," Womack failed to perform an assessment of malingering in his examination; in fact, "malinger" and "malingering" do **not** appear in the first report. (RR3.DX-5; App.142-152-128).

48.     Womack concluded that based on Article 46.05(h), Battaglia is competent to be executed, but he did **not** follow the *Panetti*-standard, writing (RR3.DX-5.10-11; App.142-152):

> "…[p]rovided clear examples he understands the fact the state intends to execute him and it seeks to do so imminently. He acknowledged he had been convicted of murdering of his two daughters but denied having done so. He demonstrated his knowledge the state intends to carry out the execution imminently when he said the execution date is December 7, 2016. At no time did he express any confusion as to these two points. When asked if another party had, in fact, murdered his daughters, would this fact justify that party executed, he stated, 'Technically yes.' This answer reflects his knowledge the state has the legal right to carry out the punishment for the conviction of Capital Murder."

49.     After the first interview/evaluation, Womack was concerned that after reading that the other experts identified Delusional Disorder and he had **not** even addressed it (RR2.18). Womack returned on November 13, 2016 (the day before the *Panetti*-hearing) and conducted another "evaluation." (RR3.DX-22; App.153-159).

50.     Womack told Battaglia that he must perform a second "evaluation" because "…there was a disparity in the reported presentation in the mental status sections of the other three reports and that which (Womack) had experienced with him the first time, and (Womack) wanted

to talk to him more to get a clearer picture and to ask him follow-up questions that had not been asked in the (first) evaluation." (RR2.28-29; App.428.429).

51.     Womack conducted **no** testing, used **no** testing for his conclusions, yet made a "finding" of a **"provisional"** question of malingering, which is **not** a diagnosis of malingering, but indicates that he could **not** make the diagnosis of malingering (RR2.30.61; RR3.DX-22.4; App.156.430.461) ("**Question:** So the DSM5 allows for a provisional that's not at the level of a diagnosis, but it's a maybe, but need more information? **Womack:**  Correct.").

52.     In Womack's opinion, because Battaglia is "highly intelligent" and has made "exculpatory comments independent of seeming delusional ideas," Battaglia is "likely not to have a delusional disorder." (RR3.DX-22 2-3, 7; App.154-155.159). However, Womack admitted that delusional persons he had dealt with in the past "tend to be rather high in intelligence." (RR2.26; App.426).

## VII. Argument

### 1. Battaglia's counsel have not had a meaningful opportunity to investigate and prepare a habeas corpus application for Battaglia

53.     *Under* Harbison v. Bell, 556 U.S. 180 (2009) and 18 U.S.C. § 3599 (2017) (as detailed in the opposed motion for investigative funding filed immediately prior to the filing of this motion), undersigned counsel must represent Battaglia in ***any proceeding*** either federal or state from the time of appointment. The issue before *Harbison* was whether federally appointed counsel should represent their clients in state-clemency proceedings.

54.     In *Harbison*, the SCOTUS provides the answer to the question before this court, and Battaglia must be allowed to proceed on the merits of his federal habeas claims (*Harbison*, 556 U.S. at 185-186):

"Under a straightforward reading of the statute, subsection (a)(2) triggers the appointment of counsel for habeas petitioners, and subsection (e) governs the scope of appointed counsel's duties. See § 3599(a)(2) (stating that habeas petitioners challenging a death sentence shall be entitled to "the furnishing of . . . services in accordance with subsections (b) through (f)"). Thus, once federally funded counsel is appointed to represent a state prisoner in § 2254 proceedings, he 'shall also represent the defendant in such…proceedings for executive or other clemency as may be available to the defendant." § 3599(e). Because state clemency proceedings are "available" to state petitioners who obtain representation pursuant to subsection (a)(2), the statutory language indicates that appointed counsel's authorized representation includes such proceedings."

55.    Further, 18 U.S.C. § 3599(e) (2017) provides,

"Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant."

56.    18 U.S.C. § 3599(e) (2017) extends this rule to every legitimate proceeding, and a *Panetti/Ford* competency-to-be-executed proceeding clearly falls under this category.

57.    Undersigned counsel are both appointed under 18 U.S.C. § 3599 (2017), and the statute and *Harbison* are clear on the issue.

58.    *Harbison* also provides that "Pursuant to § 3599(e)'s provision that counsel may represent her client in "other appropriate motions and procedures," a district court may determine on a case-by-case basis that it is appropriate for federal counsel to exhaust a claim during her federal habeas representation. This is not the same as classifying state habeas proceedings as "available post-conviction process" within the meaning of the statute." *Harbison*, *id*. at 190 fn.7.

59.    Per the rules of exhaustion of issues, counsel had to first go to state court to exhaust the *Panetti* issue. Now counsel is litigating on behalf of Battaglia in federal court.

60.     Counsel also note that a *Ford/Panetti* hearing is **not** a "state habeas proceeding." Rather, it is a proceeding used to stay an execution due to the **present incompetency** of the inmate.  As the record below indicates, the state court first wouldn't agree to appoint counsel on the case. Then this Court would not appoint counsel.

61.     The Fifth Circuit reversed this Court in *Battaglia*, 824 F.3d at 474-476. It held, first, that Battaglia had been abandoned by his prior appointed counsel and was entitled to appointment of new counsel with respect to his *Ford/Panetti* claim. It also held that he was entitled to a stay of execution to make that representation meaningful: "In our view, it would be improper to approve his execution before his newly appointed counsel has time to develop his *Ford* claim."  Although counsel was subsequently appointed, it remains the case that Battaglia has not yet received the meaningful representation in his federal habeas corpus proceeding to which he is entitled by § 3599. Further, the Fifth Circuit noted that § 3599 provides that "[u]nless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including…all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures."

62.     Thus, the issue of Battaglia's right to fully litigate the motion for funding, the SCOTUS petition, and his upcoming federal habeas petition is not only settled law, but it is the **law-of-the-case** per the Fifth Circuit's ruling in 2016.

63.     Under the **law-of-the-case** doctrine, litigation on an issue already decided by an appellate court must come to an end since courts **cannot** efficiently perform their duties if a question, once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal. *Browning v. Navarro*, 887 F.2d 553, 556 (5th Cir. 1989).

64.     And, because Battaglia's right to undersigned federal counsel's litigation of the issues is the **law-of-the-case**, the Fifth Circuit will rule as it did in *Battaglia*, 824 F.3d at 474-476 because the law-of-the-case doctrine prohibits the reconsideration of this this issue. When a prior panel of the Fifth Circuit discusses an issue on the merits, under the law-of-the-case doctrine, a later panel **cannot** reach a contrary conclusion. *Williams v. City of New Orleans*, 763 F.2d 667, 669 (5th Cir. 1985).

65.     It is also **very important to note** that the Fifth Circuit stayed the first execution date in 2016 so that Battaglia's counsel may pursue all legal remedies available under 18 U.S.C. § 3599 (2016). Remedies under 18 U.S.C. § 3599 (2016) do **not** include only state competency-proceedings. Remedies include funding petitions to the SCOTUS, all available postconviction processes, applications for stays of execution and other appropriate motions and procedures, federal competency proceedings in habeas corpus, and proceedings for executive or other clemency as may be available to Battaglia.

66.     Thus, Battaglia believes that the trial court's setting an execution date **violates** the ruling of the Fifth Circuit in which the Fifth Circuit stayed the March 30, 2016 execution-date and appointed Mr. Gardner as counsel. *Battaglia*, 824 F.3d at 474-476.

67.     In summary, under *Harbison* and 18 U.S.C. 3599, undersigned counsel is required to represent Battaglia: (1) throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals,  petitions to the SCOTUS, and all available postconviction process; (2) in applications for stays of execution and other appropriate motions and procedures; (3) in competency proceedings; and (4) proceedings for executive or other clemency as may be available to Battaglia.

68.     Battaglia is constitutionally entitled to these legal services, so he **cannot** be executed on February 1, 2018.

**2.   As Battaglia details above in the facts and in his opposed motion for investigative funding filed immediately prior to the filing of this motion, he has meritorious claims. Thus, *Harbison* and 18 U.S.C. § 3599 mandates that Battaglia receive investigative services through a mitigation specialist before he files a habeas petition, and Battaglia needs time to litigate these issues**

69.     Contemporaneously with this stay-motion, Mr. Battaglia has sought the authorization of investigative services to assist his counsel in preparing a habeas corpus application raising an execution incompetency claim. When such services were sought in state court to investigate and prepare an Eighth Amendment incompetency claim, the state court denied the request. As these services were reasonably necessary to his representation on execution competency, Battaglia still has not received the meaningful representation to which he is entitled under § 3599.  Nor will one month be sufficient time for counsel to meaningfully utilize the investigative services he has requested, i.e., to conduct an investigation of Mr. Battaglia's background, prepare a psychosocial history, and prepare a federal habeas corpus application. Accordingly, a stay of execution is necessary to effectuate Mr. Battaglia's representation rights. McFarland *v. Scott*, 512 U.S. 849, 858 (1994).  Especially in light of the colorable showing Mr. Battaglia has made, a stay of execution to permit counsel to conduct these activities is warranted. See *In re Hearn*, 376 F.3d 447 (5th Cir. 2004), *clarified by In re Hearn*, 389 F.3d 122, 123 (5th Cir. 2004) (granting a stay of execution to give meaningful effect to the federal statutory right to counsel upon a colorable showing of possible merit).

70.     Battaglia argues that the correct test is a "reasonable need" from the plain language of § 3599(f), when the trial court denied Battaglia's motion for a mitigation specialist, Battaglia

met the "substantial-needs" test.  But, under the substantial-need test, § 3599(f) authorizes services when a movant can establish a "substantial need" for the services, and Battaglia has done so.

71.     Even if this Court questions whether Battaglia has met this test, the language of § 3599(f) is clear, and when the statutory language is plain, a court must enforce it according to its terms. *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) and *Corley v. United States*, 556 U.S. 303, 316 (2009).

72.     Under *Ward v. Stevens*, 777 F.3d 250, 266 (5th Cir. 2015), funding should be denied only if: (1) it supports a meritless claim, meaning that the claim on its face would never success (*i.e.*, such as where an inmate whose measured WAIS-IV IQ score is 100 and yet he requests funding for an *Atkins* claim), (2) it merely supplements prior evidence, or (3) the constitutional claim is procedurally barred at the time the motion is made. None of the *Ward* factors exist here.

73.     Though erroneous, the substantial-needs test does **not** allow a court to place the "cart-before-the-horse" and conclude that a petitioner is **not** entitled to auxiliary representation services because he failed to present sufficient evidence showing that he may have a viable claim for relief. This is tantamount to **not** giving a person the opportunity to gain experience, and at the same time criticizing that person for lacking experience.

74.     By requiring Battaglia to prove the merits of his claims as a precondition for investigative services violates the plain language of both the plain language of § 3599(f) and the substantial-needs test. § 3599(f) was enacted to enhance representation for a capital defendant and ensure that potentially meritorious claims are **investigated and litigated**.

75.     A claim **cannot** be litigated before it is investigated. A scheme that does not allow auxiliary representation services based on a conclusion that the claim has no merit since there is little evidence supporting the claim violates § 3599(f).

26

76.     As Battaglia details in the motion requesting services, there are several reasons why a mitigation specialist is necessary: (1) obtain and review voluminous records from TDCJ and Battaglia's medical records, which to counsel's knowledge had not been collected or reviewed by previous counsel; (2) collect information about Battaglia's background, including environmental and genetic risk-factors; and (3) and present understanding of his death sentence by interviewing collateral sources, including Battaglia's family members and others with whom Battaglia communicates.

77.     Further, it was **not** Battaglia's fault that the services of the mitigation specialist was denied by the trial court. If this Court prevents counsel the ability to investigate and present relevant factual allegations that the mitigation specialist would uncover, these meritorious factual issues will "never be heard," and Congress "did not intend for the express requirement" of investigative services "to be defeated in this manner." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). *See also Martel v. Clair*, 565 U.S. 648, 662-663 (2012) (§ 3599 grants federal capital defendants and capital habeas petitioners "enhanced rights of representation."). The purpose of § 3599 is to "improve the quality of representation afforded to capital [habeas] petitioners and defendants alike." *Martel*, 565 U.S. at 659. 18 U.S.C. § 3599(f) (2017) accomplishes this by requiring lawyers in capital cases to have more legal experience than 18 U.S.C. § 3006A (2017) demands in the non-capital context. *Id*.

78.     And, as it is most relevant here, 18 U.S.C. § 3599(f) (2017) provides more money for investigative and expert services than are available under Section 3006A. These measures "'reflec[t] a determination that quality legal representation is necessary' to foster 'fundamental fairness in the imposition of the death penalty.'" *Id*., *quoting McFarland*, 512 U.S. at 855, 859.

79.     As also discussed in the motion requesting investigative services, when this court considers the trial court's findings (App.164-177), the trial court ignored the findings of Drs. Proctor, Allen, and Mosnik, and based its decision solely on Womack's 'non-findings' of "provisional malingering," which is not a finding of malingering. The trial court cited records from TDCJ, interviews Battaglia gave to the media, recordings of jail-calls Battaglia made, and the transcript of the 2002 trial. (App.169).

80.     Based on the erroneous findings of the trial court, the TCCA concluded that "[R]ecognizing that it was within the trial court's discretion to evaluate the weight and credibility of the conflicting evidence, we hold that the record supports the trial court's determination that Battaglia is competent to be executed." *Battaglia*, 2017 Tex. Crim. App. LEXIS 908, at* 91-92. And, the TCCA concluded **"[T]here is support in the record that Battaglia is malingering."** *Id*. (emphasis supplied) .

81.     However, Drs. Proctor, Allen, and Mosnik found that Battaglia was **not** malingering, and that he is incompetent to be executed. On the other hand, Womack conducted **no** testing, depended on **no** testing, but instead made a "finding" of a **"provisional"** question of malingering, which is **not** a diagnosis of malingering, but indicates that he could **not** make the diagnosis of malingering (RR2.30.61; RR3.DX-22.4; App.156.430.461).

82.     Thus, the "record" that the TCCA describes that "support(s)" a finding of malingering purportedly came from sources other than the experts.

83.     The information that counsel needed a mitigation specialist to obtain and evaluate (voluminous records from TDCJ and Battaglia's medical records, Battaglia's background, including environmental and genetic risk-factors, and a presentation of an understanding of his death sentence by interviewing collateral sources, including Battaglia's family members and others

with whom Battaglia communicates) would have helped put the information from sources other than the experts in perspective.

84.     Finally, as Judge Alcala points out in her dissent in *Battaglia*, 2017 Tex. Crim. App. LEXIS 908 (Alcala, J. dissenting), the trial judge's statements "…[s]uggest that he was mistaken in believing that Article 46.05 by itself is an adequate standard for evaluating a defendant's competency to be executed. These statements also reflect the trial judge's mistaken impression that *Panetti* is an unclear decision which stands for nothing more than the proposition that evidence of delusions must not be categorically ignored in assessing a defendant's competency to be executed." *Battaglia*, *id*. at *113.

85.     Further, the trial judge believed that Article 46.05 alone is determinative, and it is **not**. As Judge Alcala pointed out, while questioning Dr. Proctor, the trial court asked, "But [appellant] is in your opinion competent under 46.05, but [ ] his delusions, in your opinion, are such that he doesn't have a factual understanding of what he did, an accurate factual understanding of what he did?" The trial judge's questions show that he was focused on the portion of Article 46.05 addressing whether the defendant understood "the reason he or she is being executed" and ignored that *Panetti* modified Article 46.05.

86.     In other words, Tex. Code Crim. Proc. Art. 46.05(h) (2016) provides, "[A] defendant is incompetent to be executed if the defendant does not understand: (1) that he or she is to be executed and that the execution is imminent; and (2) the reason he or she is being executed."

87.     However, under *Panetti*, Art. 46.05(h) is **modified** to: a defendant is incompetent to be executed if the defendant does **not**: (1) understand that he is to be executed and that the execution is imminent; and (2) have a rational understanding of the reason he is being executed.

29

*Panetti*, 551 U.S. at 959; Tex. Code Crim. Proc. Art. 46.05(h) (2016); *see also Mays v. State*, 476 S.W.3d 454, 457 fn.4 (Tex. Crim. App. 2015) ("With respect to the second prong, a defendant does not understand the reason for his execution unless he has a 'rational understanding' of that reason," citing *Panetti*, 551 U.S. at 959).

88.     And, after the experts submitted their reports to the parties and the trial court, the trial court initiated an *ex parte* communication with Dr. Allen, asking him "...[w]hat if it (the standard) doesn't involve rational understanding." (RR1.182; App.371). The trial judge's ruling also shows that he did **not** understand the *Panetti*-standard.

89.     Judge Alcala also pointed out that during the hearing, the trial judge stated,

> "I read Panetti many times, and I read it very carefully. **Panetti that hold [sic] that if the defendant lacks a rational understanding, that he's necessarily not competent to be executed. That's just not what—that's just not what the Supreme Court said. The holding is that once the prisoner meets the statutory definition of [Article] 46.05, I can't treat any delusional beliefs as irrelevant. That's the holding of the case.** And if there's another Eighth Amendment analysis that has to be done, I'm going to do my very best to make that Eighth Amendment analysis…But, you know, it explicitly says in Panetti that we reject the standard followed by the court of appeals, and we do not attempt to set down the rule governing all competency determinations. And that's—that's very clear in Panetti."

*Battaglia*, *id*. at *115. (See RR1.183-184; App.372-373). The trial judge's interpretation of *Panetti* is obviously **not** its holding.

90.     Thus, Battaglia has a potentially meritorious claim since if the trial judge does **not** understand the basic holding of *Panetti*, which is the operative case, Battaglia has the constitutional right to litigate these issues in federal court.

91.     Although incomplete due to the state court's denial of investigative services to Battaglia, he has nevertheless amply made a substantial showing of incompetence, entitling him to a stay of execution to adjudicate his claim in federal court. *Ford* claimants are entitled to certain

procedural protections mandated by due process when litigating competency. At its core, "[t]he fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914).

92.    These due process protections are triggered once the prisoner has established a threshold showing of incompetency. *Panetti*, 551 U.S. at 949 ("Once a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness" (quoting *Ford v. Wainwright*, 477 U.S. 399, 424, 426 (1986) (Powell, J., concurring))). *See also* Memorandum and Order at 2, *Eldridge v. Stephens*, No. 05-cv-01847, 2009 U.S. Dist. LEXIS 106991 (S.D. Tex. Nov. 17, 2009) ("If . . . a [substantial threshold] showing [of insanity] is made, the execution must be delayed to permit a 'fair hearing' to determine competency to be executed," citing *Panetti*, *id* at 934-935.).

## VIII.   Conclusion and Prayer

Petitioner John David Battaglia prays that the court grant this opposed motion for stay of execution, and stay the execution date of February 1, 2018 so that he may meaningfully exercise his representation rights under 18 U.S.C. § 3599 (2017) and receive due process on his *Ford/Panetti* claim in federal habeas corpus proceedings.

Respectfully submitted,

Gregory W. Gardner
P.O. Box 2366
Boulder, Colorado 80306
Phone: (303) 552-2979
Fax: (202) 747-2986
gardnerlegal@gmail.com

Michael Mowla
P.O. Box 868
Cedar Hill, TX 75106
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Petitioner

**/s/ Michael Mowla**
**Michael Mowla**

## IX.  Certificate of Conference

I certify that I conferred with Erich Dryden of the Texas Attorney General's Office, who indicated that the Government is opposed to the relief requested in this motion.

**/s/ Michael Mowla**
**Michael Mowla**

## X.  Certificate of Service

I certify that on January 2, 2018, this document and its Appendix were served through the ECF system on the Texas Attorney General's Office.

**/s/ Michael Mowla**
**Michael Mowla**